IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 4, 2018

## IN RE MORGAN K.

**Appeal from the Juvenile Court for White County**
**No. 4442      Sammie E. Benningfield, Jr., Judge**

_____

**No. M2018-00040-COA-R3-PT**

_____

Father appeals from the trial court's order terminating his parental rights. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P. J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

J. Patrick Hayes, Cookville, Tennessee, for the appellant, Terry K.

Herbert H. Slatery, III, Attorney General and Reporter; Brian A. Pierce, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

### Background

The child at issue in this case, Morgan K., was born in February 2015, to unmarried parents Sherri K. ("Mother") and Terry K. ("Father").[1] Initially, Father was not listed as the father on the child's birth certificate, although Father and Mother were apparently residing together and caring for the child.[2] The Tennessee Department of Children's Services ("DCS") received its first referral regarding the child on December 10, 2015, and became concerned about the presence of drugs in Mother's home. A DCS

---

[1] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] Mother voluntarily relinquished her parental rights the day of trial and is not a party to this appeal.

caseworker and a Sparta police officer[3] visited the home and requested that Mother and Father submit to drug screens. Father refused, informing the caseworker that because there was no proof he was the child's biological father, he did not have to submit to any drug testing. Subsequently, the Sparta police officer realized that there was an active warrant for Father's arrest, and Father was taken into custody.[4]

DCS remained involved with the child over the next several months due to Mother's admitted drug usage, although the child remained in Mother's custody until June of 2016. At that time, DCS received a second referral regarding Mother's continued substance abuse, as well as ongoing domestic violence issues with Mother's new boyfriend. The child was removed from Mother's custody on June 3, 2016, following an unscheduled home visit. Father was still serving his sentence for violating his probation, and was not released until July 10, 2016.

The child was adjudicated dependent and neglected via an order entered July 25, 2016. Both Mother and Father attended the hearing. In its order, the Juvenile Court for White County ("trial court" or "juvenile court") made detailed factual findings regarding the conditions necessitating removal. Specifically, the trial court determined that Mother admitted to abusing opiates and marijuana, as well as recently snorting hydrocodone in front of the child. Moreover, the trial court's order expressed concern over the child's health issues. The child was born with a club foot and was required to consistently wear a protective brace; however, a DCS caseworker observed the child to be without the brace during the home visit prior to the removal.

DCS developed three permanency plans during this case.[5] The first plan was developed June 23, 2016, and contained the following actions steps for Father: (1) submit to a paternity test to establish parentage for the child; (2) refrain from involvement in substance abuse and crime; (3) submit to random drug screens, both urine and hair follicle; (4) obtain and maintain sobriety; (5) complete an alcohol and drug assessment and provide a release for those records to DCS; (6) refrain from associating with known drug abusers; (7) follow all requirements of probation; (8) obtain and maintain safe and stable housing, and provide verification of such housing to DCS; (9) obtain and maintain a legal source of income; and (10) complete anger management classes. Father did not participate in the creation of this plan, as he was still incarcerated, but the family's DCS

---

[3] Mother and Father have had issues with DCS in the past, and the caseworker did not feel safe going to the family home without a law enforcement officer present.

[4] At the time of the first referral to DCS in December of 2015, Father was serving probation for domestic assault. In November of 2015, however, Father incurred an unrelated charged for aggravated assault, and tested positive for methamphetamine during a drug screen administered by his probation officer. Thus, the active warrant that was out for Father in December of 2015 was for violating his probation for the domestic assault.

[5] Although the permanency plan was revised three times during this case, Father's action steps and desired outcomes remained largely the same in all three versions of the plan.

caseworker reviewed the plan with Father, and Father was in agreement with the action steps. The plan was ratified on December 5, 2016. Father also underwent paternity testing in November of 2016, which revealed that Father is the child's biological parent. A parentage order adjudicating Father the legal parent of the child was eventually entered in January 2017.

The permanency plan was revised with Father's participation on December 20, 2016, and largely contained the same requirements as to Father. While Father completed one drug screen on November 22, 2016, the revised permanency plan noted that Father thereafter refused to submit to any further drug testing. This second plan also noted that Father still needed to complete an alcohol and drug assessment and attend anger management classes. The revised permanency plan was ratified by the trial court at a hearing held on May 22, 2017. By May of 2017, however, Father still had not submitted to any more requested drug screens by DCS, and the quarterly progress report regarding the child noted that Father was making essentially no progress on his permanency plan. While Father testified at the May 22, 2017 hearing that he was participating in anger management, he also testified that he still had not completed an alcohol and drug assessment.

Given the circumstances, DCS filed its first petition for termination of Father's parental rights on May 22, 2017. In the petition, DCS alleged two statutory grounds for the termination of Father's parental rights: abandonment by willful failure to support, pursuant to Tennessee Code Annotated section 36-1-113(g)(1), and substantial noncompliance with the permanency plan, pursuant to Tennessee Code Annotated section 36-1-113(g)(2). DCS averred that Father failed to contribute any support to the child since her placement in foster care, despite Father being able-bodied and "capable of working and supporting" the child. With regard to substantial noncompliance, the petition simply averred that Father did not complete his requirements under the permanency plan. The petition also noted that Father signed an acknowledgment of receipt of the Criteria and Procedure for Termination of Parental Rights on two separate occasions, first on November 8, 2016, and again on January 24, 2017.

The trial court then held a third and final permanency plan ratification hearing; Father did not attend. The trial court entered its ratification order July 17, 2017, and noted that the child had, by that time, been in foster care for thirteen months and that adoption was an appropriate goal. As previously noted, the third permanency plan contained essentially the same action steps as the first and second plans. DCS then filed an amended termination petition on September 26, 2017, adding failure to manifest an ability and willingness to assume custody of the child as the third statutory ground for termination. Tenn. Code Ann. § 36-1-113(g)(14).[6] A trial took place on December 1, 2017.

---

[6] In its amended petition, DCS also raised the allegation that Father was perhaps not the child's legal parent. This argument, however, is perplexing because Father underwent DNA testing that proves he

The trial court first heard testimony from Sherri Phillips, who was the DCS caseworker assigned to this case for its duration. With regard to Father, Ms. Phillips testified that she was unaware of any financial support Father offered the child during the seventeen months the child was in foster care. Ms. Phillips indicated that Father was unemployed, but that she did not know the specific circumstances of his financial situation, as Father refused to share that information with her. Ms. Phillips did, however, acknowledge that when Father would visit the child, he "always brought [the child] something, whether it is an outfit, whether it's a toy, whether it's something to eat. [Father] always plays with her."

In addressing the permanency plan, Ms. Phillips testified that in her opinion, Father did not attempt to complete the required steps. The greatest concern to Ms. Phillips was Father's adamant refusal to submit to random drug screens. While Father did submit to three drug screens between June of 2016 and the date of trial, all of these screens were pre-scheduled. According to Ms. Phillips, every time she attempted to randomly screen Father, he refused:

> [O]ut of the seventeen months I have requested at least one drug screen a month and he has only submitted to three. Now the latest drug screen that I had asked, for instance, for the month of November, he had a visit on November the 14th, I asked for a drug screen, he adamantly refused saying that he had taken too much cold medicine and that he was not going to drug screen for me that day. I informed him that there should not be anything in that cold medicine that would come up positive on a urine drug screen but he adamantly refused. On November the 28th was his next visit. I asked for a drug screen and he provided a urine drug screen. But he had also showed me verification that he had provided a urine drug screen for his probation officer that same morning. When urine drug screens and hair follicles are required on a Permanency Plan and you ask for them and they adamantly refuse and do not want to take them unless they want to, that doesn't tell me that they are sober . . . [Father] does not want to give any drug screens when asked at random. He's refused hair follicles. He's refused the urine drug screens. To the department that is a concern. Because if he is not using and there is no concerns with drugs then he should be willing to give drug screens at any time and not have to be at his convenience.

is the biological parent, and the trial court then entered a parentage order based on the results prior to the filing of the initial termination petition. Further, in the parentage order the trial court changed the last name of the child to that of Father. DCS does not contend on appeal that Father should not be treated as the child's legal parent for purposes of termination of his parental rights.

- 4 -

In Ms. Phillips's view, Father's recalcitrance towards the required drug screens posed the most significant barrier to reunification with the child. Ms. Phillips expressed further concern over the fact that it took Father nearly a year to complete his anger management program. Indeed, Ms. Phillips stated that she received verification of Father's completion of the anger management program only after the original petition for termination was filed.

Additionally, Ms. Phillips was concerned that Father seemed to have no permanent home; although Father apparently lived with his mother at various points during the pendency of this case, Father previously expressed to Ms. Phillips that his mother's home would not be a good environment for the child. Overall, Ms. Phillips's testimony reflected her opinion that placing the child in Father's custody would be unsafe for the child, as Father was "still having issues with drug abuse or the lack of submitting to drug screens to prove that there is sobriety[,]" and "[t]here [was] still not safe and stable housing."

Finally, Ms. Phillips discussed the progress made by the child while in her foster care placement. While the child suffered from significant physical and cognitive difficulties at the time of her removal, Ms. Phillips testified that the child has all but completely overcome these obstacles. Specifically, Ms. Phillips testified that after receiving treatment from Vanderbilt, the child's club foot is almost entirely rehabilitated, and the child has greatly benefitted from speech therapy with Tennessee Early Intervention Services ("TEIS"). Ms. Phillips also indicated that the child's foster parents wish to adopt her, and that in Ms. Phillips's opinion it would be in the child's best interest for Father's parental rights to be terminated.

In contrast, Father testified at trial that he did complete his permanency plan to the best of his ability. According to Father, he delayed taking his actions steps under the plan because he was waiting to receive the results of the paternity test. Father also disputed Ms. Phillips's contention that he has nowhere to live; rather, Father testified that he currently lives with his sister and that his sister is responsible for all of the household bills. Father testified that he does not have to pay for rent or utilities and that he has a cellphone that his sister pays for. He also stated that he receives food stamps.

When questioned about his work history, Father insisted that he is unable to work due to having been diagnosed with chronic obstructive pulmonary disease ("COPD") in 2010. Father stated that he has never held a traditional job, and has only ever done "odd jobs here and there." Despite Father's insistence that he is unable to work, Father admitted that he did hold a farm job in 2015; according to Father, he owed a debt to the farm owner and repaid the debt through labor. While Father indicated that he was not currently searching for a job, he testified that he was in the process of filing for disability and social security benefits. When questioned about how Father would support himself if

given custody of the child and denied disability, Father stated "I guess I will have to try to work."

In response to questions about his refusal to submit to drug screens requested by DCS, Father stated that he did not remember being asked to take any drug screens, other than on four occasions. Father insisted that when he was asked to take drug screens, he complied; however, when asked about refusing to take a hair follicle test, Father indicated that he did not think "[he] should have to do drug screens and a hair follicle." Despite Ms. Phillips's testimony that she asked Father for a drug screen at least once a month, Father adamantly maintained that he was only asked for random drug screens on four occasions. In concluding his testimony, Father urged that the child deserves the chance to be reunited with her family, and that Father wants the opportunity to raise the child.

The last witness the trial court heard from was the child's foster father, who testified that he and his wife had been caring for the child since June of 2016 and that her condition has vastly improved since then. Specifically, foster father testified that the child rarely needs to wear her foot brace and that although the child only knew one or two words upon arriving in their home, the child has since gained a fairly expansive vocabulary. According to foster father, the child is read to regularly, has grown attached to the foster parents' extended family, and has made several friends in her daycare program. Finally, foster father testified that both he and his wife want to adopt the child should the opportunity arise.

After foster father's testimony, the trial court heard closing arguments and rendered an oral ruling that DCS proved all three alleged statutory grounds for termination by clear and convincing evidence, and that termination of Father's parental rights was in the child's best interest. In addressing the grounds, the trial court noted its concern that Father has never sought gainful employment; although Father testified that he does not work because of his COPD, the trial court questioned Father's credibility on this point. Notably, the court pointed out that while Father claims to be unable to work due to COPD, Father also testified that he worked on a farm briefly in 2015 and admitted to smoking two packs of cigarettes daily. In the trial court's view, the foregoing evidence demanded the conclusion that Father willingly failed to support the child.

With regard to the second ground, substantial noncompliance, the trial court expressed great concern over Father's refusal to take the required drug screens. As the trial court pointed out, "[t]he primary reason the child was removed from the mother and the father is due to drug use." Further, the trial court found it "suspicious" that the only drug screens Father willingly submitted to were screens he knew of in advance. Accordingly, the trial court concluded that clear and convincing evidence supported the finding that Father was in substantial noncompliance with his permanency plan.

Finally, the trial court addressed the third statutory ground for termination, failure to manifest an ability and willingness to assume custody of the child:

> [Father] has not gotten himself in a position to be able to support really himself much less a child. Were it not for his sister, by his testimony, he wouldn't have a place to live, he wouldn't have food to eat, buy his clothes. I don't know where he gets the money for his cigarettes. The court finds also in retrospect, going back to the failure to work, it is funny to me, or strange, that you can be active enough to commit aggravated assault and domestic assault, and work on a farm, and smoke cigarettes, and you do all those things with COPD, but you can't work. That is not consistent and that gives the court quite a bit of concern about the credibility of [Father] and his testimony. He's not in a pleasant situation. He's not complied with the Permanency Plan. We can't send the child home with him, so he can't assume custody. We have to take his word for it that he has even got a place to live.

Essentially, in the trial court's view, there was simply no evidence to suggest that Father was able to care for the child at the time of trial, and it was unconfirmed that Father even had a permanent place for he and the child to reside. Thus, the trial court concluded that clear and convincing evidence supported the third ground for termination as well.

> In addressing the best interest of the child, the trial court explained:

> I think it is conceded by everyone that a child needs permanency. I think that's pretty well a given. And this child has been in custody already, foster care, for seventeen months. Without a termination, with no prospect of even an early return, how long are we going to leave the child in foster care without some potential for return? She's in a placement, an appropriate placement, where she has made tremendous progress since her entry there. She's bonded to that family, and [foster father] testified that they wish to adopt the child. And for all of those reasons the court finds it is in the best interest of the child that [Father's] rights be terminated and does so.

The trial court entered a written order for termination of Father's parental rights on December 20, 2017, and Father filed a timely notice of appeal on January 2, 2018.

## Issues Presented

The issues presented for review in this case, as we perceive them, are as follows:

1. Did the trial court err in concluding that clear and convincing evidence supports the termination of Father's parental rights, based upon Tenn. Code Ann. §§ 36-1-113(g)(1), (2), and (14)?

2. Did the trial court err in concluding that clear and convincing evidence supports the finding that termination of Father's parental rights is in the best interest of the child?

**Standard of Review**

The Tennessee Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party

must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.,* 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.,* 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Finally, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

### Discussion

In his appellate brief, Father challenges all three statutory grounds upon which the trial court relied in terminating Father's parental rights, as well as the finding that termination is in the child's best interest. We address these arguments in turn, beginning with a review of each of the three relevant statutory grounds.

### I. Grounds for Termination

### 1. Abandonment by willful failure to support

Abandonment is a statutory ground for termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(1). For purposes of this appeal, Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i).[7] The four-month period in this case spans from January 22, 2017 to May 21, 2017. Father does not contend in this appeal that he paid any support during this time frame. Instead, Father's only argument is that DCS failed to present sufficient evidence to show that his failure to support during this time frame was willful, as Father was not employed during this time.

---

[7] In 2018, the Tennessee General Assembly saw fit to amend our termination of parental rights statutes to remove the element of willfulness from the definition of abandonment by failure to support or visit. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) (defining abandonment as, inter alia, "[f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child"). Rather than include willfulness as an element of the ground, Tennessee Code Annotated section 36-1-102(1) now provides that it is an affirmative defense:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1)(I), *enacted by* 2018 Tennessee Laws Pub. Ch. 875 (H.B. 1856), *eff.* July 1, 2018. We have previously held that this change will not apply retroactively. *See In re Gabriel B.*, No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *4 (Tenn. Ct. App. July 23, 2018) (citing *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004)) ("Because this change is substantive rather than procedural or remedial, however, the amended statute will not be applied retroactively to this case."). As such, we apply the version of the statute at issue when the case was initiated.

A central inquiry a court must make when determining whether a parent abandoned its child pursuant to section 36-1-102(1)(A)(i) is whether the abandonment was willful. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i). This Court has explained the concept of willfulness in parental termination cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.
>
> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty[] or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child[.] The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially.
>
> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863−64 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted). For purposes of this case, the burden is on the petitioner to prove willfulness. *See **In re: Leroy H.***, No. M2017-02273-COA-R3-PT, 2018 WL 3700917, at *8 (Tenn. Ct. App. Aug. 3, 2018) (discussing the burden to show willfulness); ***In re Matthew T.***, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *17 (Tenn. Ct. App. Apr. 20, 2016) (holding that the petitioner failed to meet its burden to show that the parent's failure to support was willful). "'Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes

willful abandonment, however, is a question of law.'" *In re Navada*, 498 S.W.3d at 593 (quoting *In re Adoption of Angela E.*, 182 S.W.3d at 640).

In the present case, the trial court determined that clear and convincing evidence supports termination of Father's parental rights for willful failure to support largely due to its determination that despite Father being "able-bodied and capable of working and supporting the child," Father "provided no justifiable excuse for failing to support the child." In regards to Father's contention that he cannot work due to his COPD, the trial court noted that "there are any number of sedentary jobs that [Father] could perform. Any number of people work as cashiers and any number of places do not require much, if any, physical labor." Further, the trial court found that it had difficulty giving full faith and credit to Father's testimony regarding his COPD, as Father also testified that he worked on a farm in 2015 and currently smokes two packs of cigarettes daily.

As a threshold matter, we note that Father does not bear the burden of proving that he is incapable of working and supporting his child; rather, the burden lies with DCS to show that Father "had the capacity to pay, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Sophia P.*, No. M2016-01400-COA-R3-PT, 2017 WL 1191299, at *10 (Tenn. Ct. App. Mar. 30, 2017) (citing *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013)). "It is not enough for a petitioner to 'simply prove that [the parent] was not disabled during the relevant timeframe' and therefore assume that she was capable of working and paying child support." *In re Noah B.B.*, No. E2014-01676-COA-R3-PT, 2015 WL 1186018, at *9 (Tenn. Ct. App. Mar. 12, 2015) (quoting *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485, at *18 (Tenn. Ct. App. 2014)). Based upon this rule, this Court has been hesitant to find that a parent willfully failed to support a child where there is insufficient evidence in the record regarding the parent's financial situation or monthly expenses. *See e.g., id.* at *9 (holding that petitioners did not show willful failure to support where there was no evidence of mother's financial means, expenses, or obligations in the relevant four month period before the petition was filed); *In re Sophia P.*, 2017 WL 1191299, at *9 (noting that at the hearing to terminate their parental rights, mother and father were not questioned about their income or expenses during the four month period leading up to the filing of the petition; thus petitioners did not show a willful failure to support); *In re Kylea K.*, No. E2017-02097-COA-R3-PT, 2018 WL 3084530, at *7 (Tenn. Ct. App. June 21, 2018) (holding that willful failure to support was not shown where the record contained no evidence as to the father's employment, expenses, or resources during the critical four month period before the filing of the petition).

The facts of this particular case, however, are distinguishable from that of *In re Noah B.B.* and its progeny. Indeed, while that line of cases demands that there generally be evidence of a parent's expenses and financial obligations before a finding of willful failure to support can be made, the present case is unique in that DCS presented evidence that Father simply has no expenses. Unlike the parents in *In re Sophia P.*, 2017 WL 1191299, at *9, Father was questioned by DCS at length regarding his financial

obligations; according to Father, he does not pay rent or utilities, he does not have a vehicle, he does not pay his monthly telephone bill, and he purchases food with food stamps. Thus, this case does not involve the typical scenario where a parent's income is subsumed by the necessary expenses of life, making the parent incapable of paying support. Rather, DCS presented clear and convincing evidence that Father has no financial obligations. Any money that comes into Father's possession is therefore not required to meet his basic needs. Indeed, the evidence shows Father spends money on discretionary items such as cigarettes, drinks, and perhaps illegal drugs.[8]

There can be no dispute, however, that Father was not employed during the relevant timeframe. Lack of employment, however, will not always be sufficient to defeat a claim of willful failure to support when the parent has no justifiable excuse for his or her lack of employment. See *In re Sophia P.*, 2017 WL 1191299, at *9; *In re Noah B.B.*, 2015 WL 1186018, at *9. For example, in *Noah B.B.*, the mother testified at trial without dispute that she actively sought employment during the case but was largely unsuccessful. *Id.* In light of this evidence and the lack of evidence to show any income to the mother or her expenses, we concluded that clear and convincing evidence did not support this ground. *Id.* The evidence in this case is the opposite: Father testified without dispute that he has made no effort to seek employment, blaming his medical diagnosis. Here, evidence presented shows that Father has never attempted to find a job. Father's testimony, however, was not supported by any medical diagnosis from a physician or documents related to his pending disability claim. Moreover, Father's claims were undermined by his own admission that he worked on a farm in 2015, following his alleged COPD diagnosis, as well as continues to smoke two packs of cigarettes per day. In light of this evidence, the trial court expressly found that Father lacked credibility on the issue of his ability to work. When the trial court's findings are based upon credibility, we will not overturn them on appeal absent clear and convincing evidence to the contrary. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997) (this Court gives great weight to the credibility accorded to a particular witness by the trial court). Father has pointed this Court to no evidence that should overturn the trial court's credibility finding on this issue. Had Father presented some documentary evidence to support his inability to be employed, the trial court's credibility finding may not have been fatal to his claim that his lack of employment is excused. In this situation, however, we must conclude that in the absence of credible proof of a disability coupled with Father's admission that he worked in 2015 but failed to seek employment in the four months prior to the filing of the termination petition, Father's failure to seek employment does not have a justifiable excuse sufficient to defeat this ground for termination.

---

[8] Although Father denied purchasing methamphetamine, he admitted at trial that he did get it from someone else rather than making it himself. While Father denied that he is still using methamphetamine, the trial court made an express finding that it questioned Father's credibility as a witness.

- 13 -

In sum, DCS presented unrefuted proof that (1) Father has some form of income with which he purchases items for himself; (2) Father has no living expenses that would preclude him from offering some amount of support to his child; and (3) despite Father's insistence that he cannot work due to having been diagnosed with COPD in 2010, Father worked on a farm in 2015 and purchases cigarettes daily. Logic dictates in this case that Father is receiving support in some form or fashion, as he clearly finds a way to purchase items for himself. The evidence offered by DCS in this particular case, considered *in toto*, amounts to clear and convincing evidence that Father had the ability to pay at least some child support for his daughter, and simply chose not to do so. As such, we conclude that the trial court correctly determined that Father's parental rights should be terminated based upon his willful failure to support the child.

## 2. Substantial noncompliance with permanency plan

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), parental rights can be terminated when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." Termination based upon this ground "requires more proof than that a parent has not complied with every jot and title of the permanency plan." **In re M.J.B.**, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Instead, DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." **Id.** (citing **In re Valentine**, 79 S.W.3d 539, 548–49 (Tenn. 2002)). To that end, "trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." **In re M.J.B.**, 140 S.W.3d at 656–57. Rather, "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." **In re Valentine**, 79 S.W.3d at 548–49.

Here, the trial court found and it is undisputed on appeal that the requirements of the permanency plans were reasonable and related to the conditions that necessitated removal. Father asserts, however, that DCS did not meet its burden in showing that he substantially failed to comply with the requirements of the permanency plans at issue. The trial court found that Father's refusal to cooperate with DCS in addressing his substance abuse issues was the critical factor in concluding that Father was in substantial noncompliance with his permanency plan. The trial court explained in its final order:

> [T]he primary reason the child was removed from [Father] is due to drug use. The Court finds it suspicious that [Father] refuses hair follicle tests based only on the fact that [Father] states he provides the Department with enough urine screens. Submitting to random hair follicle and urine drug

screens were parts of the permanency plans. The case worker testified that [Father] had, on occasion, refused hair follicle tests. By [Father's] own testimony he refused. The case worker has testified that [Father] also refused other random drug screens. As the guardian ad litem brought out succinctly, the only drug screens that [Father] ever agreed to are planned ones. Any time it was a random drug screen, [Father] refused. [Father] also had no advocate services. [Father] is not too busy working not to go to narcotics anonymous or alcoholics anonymous. [Father] has done none of those types of services. Therefore, the Court finds by clear and convincing evidence that [Father] has been substantially noncompliant with the permanency plans.

From the record, we agree.

There can be no dispute that DCS became involved with the child due to issues of drug use. As such, the permanency plan requirements related to drug use, including submitting to random drug screenings and participating in an alcohol and drug assessment, hold particular weight in this case. *See In re M.J.B.*, 140 S.W.3d at 656. DCS provided clear and convincing evidence that Father substantially failed to comply with these requirements. Here, there is no dispute that Father failed to complete an alcohol and drug assessment in the over seventeen months that the child was in DCS custody prior to trial. Moreover, Ms. Phillips testified that of the approximately seventeen drug screenings that she requested, Father only completed three.[9] Although Father disputed this testimony, the trial court clearly credited Ms. Phillips's testimony and Father has presented nothing that leads this Court to overturn the trial court's credibility finding on this issue. *See In re Navada N.*, 498 S.W.3d at 591. Clearly, Father's noncompliance with these requirements was substantial. Father argues, however, that because he took and passed two drug screens "within two months of the trial date . . . [Father has] shown a pattern of sobriety . . . which should negate any previous missed drug screens."

Respectfully, passing a few scheduled drug screens in the months prior to trial, while refusing random drug screens on multiple occasions for over a year prior to that time, does not establish a pattern of sobriety. Moreover, the focus of this ground is not whether the parent is able to achieve the goals of the permanency plan, i.e., sobriety, but whether the parent manifested an effort to abide by the plan. *See In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016) (citing *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct.

---

[9] Notably, Ms. Phillips testified that on at least one occasion, Father become so enraged at being asked to take a drug screen that he cursed at a DCS worker and was asked to leave his visitation early. At a different visit, Father was asked to take a drug screen and responded that he would after he got something to eat for himself and the child. Father then left and did not return to that visit.

App. Mar. 2, 2009)). Father's decision to take a few scheduled drug screenings prior to trial, well after the filing of the petition for termination and after a significant period of outright refusal to participate in the permanency plans, is, simply put, "too little, too late." *See In re Michael*, No. M2015-02497-COA-R3-PT, 2016 WL 7486361, at *16 (Tenn. Ct. App. Oct. 6, 2016) (finding mother's efforts "too little, too late" where she had engaged in illegal activity following the filing of the petition and had only been out of drug treatment for two months by the time of trial); *In re Savannah F.*, No. E2015-02529-COA-R3-PT, 2016 WL 4547663, at *16 (Tenn. Ct. App. Aug. 31, 2016) (holding that parent's action in attending anger management in the weeks before trial was "too little, too late," where the parents continued to deny their role in the exposure to violence that the child experiences); *In re S.H.*, No. E2013-02007-COA-R3-PT, 2014 WL 1713769, at *8 (Tenn. Ct. App. Apr. 29, 2014) (holding that the parent's efforts were "too little, too late").

Father also failed to timely complete other requirements of the permanency plans. While Father eventually began an anger management program, he did so in April of 2017, nearly one year after the child's placement with DCS. Indeed, Ms. Phillips testified that she only received evidence of Father's completion of the program following the filing of the initial termination petition. Father's permanency plan also included the action steps of obtaining and maintaining a legal means of income and stable, permanent housing for the family. Nonetheless, Father testified at trial that he has never been gainfully employed and is not currently looking for a job. Father maintained that he has filed a disability claim due to his COPD; however, Father testified that he did not apply for disability until January of 2017, nearly seven months after the child was placed in DCS custody. Further, Father's actions steps included that he refrain from involvement with other people with substance abuse issues; however, Ms. Phillips testified that Father is still involved with the child's Mother, who is a known drug abuser and has in fact lost custody of five other children, largely due to her substance abuse issues.

On balance, we must acknowledge that some requirements of the plan were attempted or completed by Father, including undergoing paternity testing, eventually completing the anger management classes, and refraining from incurring new criminal charges. Father also now resides with his sister, whose home has been deemed safe and appropriate by DCS.[10]

In light of the importance of addressing Father's substance abuse issues, however, Father's failure to comply with the plan's requirements regarding drug screenings and an alcohol and drug assessment can only be categorized as substantial. The child's removal was first necessitated by her exposure to substance abuse in the home, and the action

---

[10] The trial court, however, had some concerns about the stability of such a placement, noting that it was essentially required to believe Father's unsupported testimony that Father has a stable home with his sister. Father's sister did not testify at trial.

steps addressing substance abuse were largely ignored by Father. As such, we cannot agree with Father that DCS failed to carry its burden of proof for this ground. We therefore conclude that clear and convincing evidence supports the trial court's finding that Father was in substantial noncompliance with his permanency plan.

**3. Failure to manifest an ability and willingness to assume custody**

The final termination ground relied upon by the trial court is Tennessee Code Annotated section 36-1-113(g)(14):

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This statutory ground is essentially two distinct elements that must each be proven by clear and convincing evidence:

> First, DCS must prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].' DCS must then prove that placing the children in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren].'

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

> With regard to substantial harm, this Court has explained that:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, 2018 WL 1629930, at *7 (quoting ***Ray v. Ray***, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted)).

Here, the trial court found that Father failed to manifest an ability and willingness to assume custody of the child primarily due to Father's failure to take the necessary steps to maintain stability and permanency in his life:

> [Father] has not put himself in a position to be able to support himself, much less a child. By his own testimony, were it not for his sister, [Father] would not have a place to live, food to eat, or clothes. [Father] is not in a pleasant situation. The Court cannot send a child home with [Father]. Thus, [Father] cannot assume custody. The Court must take [Father's] word for it that he even has a place to live. [Father] states that he can live with his sister, but [Father] has not brought her here to testify that he has a home with her, that she would support him, and that she would support the child. No testimony to that effect has been offered, not even from [Father] other than it is just where he happens to live at the present time.

Thus, because Father testified that his livelihood is entirely dependent on his sister, the trial court found that Father was not in a position to provide permanently for the child. In the trial court's view, Father is completely dependent upon others to provide for his basic support and has taken no meaningful steps since the child's removal to establish a safe and permanent home in which the child can indefinitely reside. Father avers, on the other hand, that he currently has claims for disability and social security benefits pending, and that DCS visited Father's sister's home and reported no significant problems.

After a thorough review of the record, we must agree with the trial court's finding that Father failed to manifest an ability and willingness to assume custody of the child, and that placing the child in Father's custody would pose a risk of substantial harm to the physical or psychological well-being of the child. Although we must disagree with the trial court that Father was under any burden of proof with regard to this ground, we conclude that the evidence that was presented shows that Father's overall lifestyle appears somewhat itinerant, and permanent stability is tenuous. *See In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (upholding the termination of mother's parental rights for failure to manifest an ability and willingness to assume custody where mother's living situation remained unstable and itinerant). The record reflects that before living with his sister, Father lived off and on with his mother and brother. Father candidly admitted that living in his mother's home would not be safe for the child. By the time of trial, Father had known for more than a year that he was at risk of losing custody of his daughter, yet he took essentially no steps to prepare himself to be able to support and care for a toddler. On the contrary, when asked on cross-examination how he would support the child, Father explained that he has filed for disability. Despite Father's near total reliance on the hoped-for disability benefits to support himself and the child, Father did not file for any disability until January of 2017, seven months after the child was taken into DCS custody. Moreover, when questioned about what he would do should his disability claim be denied, Father

replied "I guess I will have to work." Thus, DCS presented clear and convincing evidence that Father's ability to support the child is completely reliant on the possibility that he will eventually be awarded disability and social security benefits. Such an eventuality is certainly not guaranteed.

While we acknowledge that Father seems to have achieved at least some stability as to his living situation, Father appears to be completely dependent upon the kindness of others for his basic needs and has demonstrated a pattern of inaction when it comes to achieving permanent stability. It is entirely unclear to this Court how the many needs of a young child can be met in such an uncertain situation. Father completely lacks a long-term plan as to how he will care for and support the child should she be placed in his care, despite having had a year and half to make meaningful progress.[11]

In that vein, it further troubles this Court that Father has patently refused to submit to drug screens, knowing that such a refusal would be a violation of his permanency plan and would create a barrier to reunification with the child. In rejecting DCS's attempts to reunite him with his child, Father exhibited a complete unwillingness to parent his daughter. It would be inconceivable to find that Father manifested a willingness to assume custody of the child when the simple task of submitting to drug screens stood between father and child, and Father consistently refused to cooperate. Thus, the evidence presented shows that throughout the months the child has been in DCS custody, Father manifested neither the ability nor the willingness to assume custody of the child. *See* Tenn. Code Ann. § 36-1-113(g)(14).

Moreover, the hazards that prompted the removal of the child are not minor, trivial, or insignificant. *In re Maya R.*, 2018 WL 1629930, at *7. On the contrary, at the time of the child's removal by DCS, Father was incarcerated for domestic assault and drug charges, had no permanent home or income, and was struggling with methamphetamine abuse. By the time of trial seventeen months later, Father had demonstrated little, if any, willingness to remedy these circumstances. Indeed, because of Father's refusal to submit to drug testing, the Court is unsure if Father's substance abuse issues have been fully addressed. *See* **In re Zane W.**, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *14 (Tenn. Ct. App. July 6, 2017) (noting that termination was in the child's best interest where mother was able to maintain sobriety for the seven months before trial, but had demonstrated difficulty maintaining long-term sobriety). It is therefore our view that clear and convincing evidence supports the finding that the child would be placed at a risk of substantial harm should she return to Father's custody. Consequently, the trial court did not err in determining that clear and convincing

---

[11] To be clear, this opinion does not stand for the notion that a parent has not manifested an ability and willingness to assume custody of a child solely because the parent lives with a family member. Rather, under these narrow circumstances, it is simply our view that Father's many inactions militate against him with regard to this ground. Aside from moving in with his sister, Father has taken virtually no steps to remedy his tenuous situation.

evidence supports termination of Father's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(14).

## II. Best interest

Having determined that clear and convincing evidence supports the statutory grounds for termination of Father's parental rights, we now turn to whether termination is in the best interests of the child. "Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Even where a parent is unfit, termination may not necessarily be in the best interests of the child. *Id.*

Tennessee's termination statute lists the following factors to be used in the best interests analysis:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance

analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(9).

The Tennessee Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681−82 (Tenn. 2017) (internal citations omitted). Furthermore, "[a]scertaining a child's best interests does not call for a rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. The analysis requires "more than tallying the number of statutory factors weighing in favor of or against termination." *In re Gabriella D.*, 531 S.W.3d at 682 (citing *White v. Moody*, 171 S.W.3d 187, 193−94 (Tenn. Ct. App. 2004)). "The facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case," and the analysis "must remain a factually intensive undertaking." *In re Gabriella D.*, 531 S.W.3d at 682. Thus, "[d]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 878). In undertaking this analysis, the court must examine all of the relevant statutory factors, as well as other relevant proof put forth by the parties. *Id.*

Returning to the present case, the trial court's analysis regarding best interests is brief:

> As to [Father], the Court finds by clear and convincing evidence that terminating the parental rights of [Father] is in the best interest of the child. The child needs permanency. The child has already been in foster care for seventeen (17) months and there is no prospect of an early reunification. The child is in an appropriate placement where she has made tremendous progress since her entry there. The child is bonded to the foster family. [Foster father] testified that he and his wife wish to adopt the child. Thus, the Court finds it is in the best interest of the child that [Father's] parental rights be terminated.

As an initial matter, we must note that the trial court's final order terminating Father's parental rights does not indicate whether the trial court considered each of the best interest factors listed above. *See In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) ("When conducting the best interest analysis, courts **must** consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i).") (emphasis added). This Court, however, has a duty to expedite its review of termination cases. *See In re Carrington H.*, 483 S.W.3d at 535 (citing Tenn. R. App. P. 8A) ("Appellate review of parental termination cases is expedited."). Moreover, Father has not raised this specific deficiency as an issue on appeal. In order to expedite this appeal, we have thoroughly reviewed the record and all of the best interest factors to conclude that abundant evidence supports the trial court's determination that termination is in the child's best interests. We would caution the trial court, however, that this deficiency could pose a more significant problem under a different set of facts or where an appellant properly designates compliance with *In re Gabriella D.* as an issue for review.

In this case, Father only briefly addresses the best interests of the child in his appellate brief, arguing that during the pendency of the case Father regularly exercised visitation with the child and that child and Father enjoy a loving relationship. Father further avers that because he was not adjudicated the legal parent of the child until January of 2017, the time that the child spent in DCS custody before January of 2017 should not weigh against Father. According to Father, "the 12 months that the child was in foster care prior to him being established as the biological father should not be held against him as far as permanency of the child is concerned."

This Court is not persuaded by Father's contention that the date of the parentage order somehow bears on the best interest analysis in this case; while Father is correct in noting that the parentage order was not entered until January of 2017, Father received the results of the paternity test in November of 2016, and in December of 2016 Father participated in creating a permanency plan regarding the child. Additionally, Father was living with Mother and co-parenting the child as early as December of 2015. Despite this

fact, Father made no effort to establish paternity of the child until nearly two years later, after DCS became involved in the case. More importantly, Father cites no legal authority to support the argument that the date of his parentage order somehow affects the outcome of the best interest analysis. Consequently, Father's purported argument that the January date of the parentage order weighs in his favor is both confusing and meritless. We therefore turn our focus to the application of the best interest factors, beginning with the factors that militate in favor of termination of Father's parental rights.

First, Father has failed to make an adjustment of the circumstances, conduct, and conditions as to make it safe for the child to be in the Father's home. Tenn. Code Ann. § 36-1-113(i)(1). The primary issue in this regard is that through Father's refusal to submit to the drug screens required by DCS, he has shown a patent refusal to address the substance abuse issues that first necessitated DCS intervention. Due to Father's actions, this Court is not convinced that the child would not be once again exposed to substance abuse if she were returned to Father's care. Moreover, the evidence reflects that Father has no long-term plan as to how he will care for and support the child. As such, we cannot say that there has been an adjustment of the circumstances and conduct that first necessitated the child's placement with DCS. Tenn. Code Ann. § 36-1-113(i)(1).

Further, the child languished in foster care for seventeen months before trial, with little to no effort by Father to take advantage of the services offered to him by DCS. Tenn. Code Ann. § 36-1-113(i)(2). Indeed, the affidavit of Ms. Phillips indicates that Father was approved to receive funding for alcohol and drug assessments and anger management, and when Father indicated that he had transportation issues, Ms. Phillips arranged for Father to receive these services in-home. Tenn. Code Ann. § 36-1-113(i)(2). Father eventually took advantage of the anger management treatment, but not until April of 2017, nearly a year after the child was removed. The fact that it took Father almost a year to start utilizing the resources available to him suggests that a lasting adjustment, despite DCS's efforts, is unlikely. Tenn. Code Ann. § 36-1-113(i)(2). Father also has not sought any continuing alcohol and drug treatment as required in his permanency plan. Tenn. Code Ann. § 36-1-113(i)(1)–(2).

It also appears to us that at this point in time, a change in caretakers would be detrimental to the child. Tenn. Code Ann. § 36-1-113(i)(5). The child has been in the custody of her foster parents for more than two years now, and by all accounts the child is thriving in their care. When the child was taken into DCS custody in June of 2016, her club foot was not being cared for properly, as her parents were inconsistently using the child's foot brace. The child's foster father testified that the child did not have the appropriate vocabulary of an almost two-year old child, and in fact could barely speak. The foster father further testified that when the child first came into their custody, she would become quite angry at being presented with any kind of restriction, and had issues adapting to the foster parents' rules. By the time of trial, however, the child had adapted quite well to her foster home; after receiving treatment on her foot the child has increased

mobility and no longer needs to wear her brace, and her foster father testified that the child has gained a vocabulary of at least two thousand words. The child has apparently become quite attached to the foster parents and refers to them as "mommy" and "daddy," and has also become attached to the couples' other foster child, a baby boy. Tenn. Code Ann. § 36-1-113(i)(5). Based on the foregoing, it is difficult to imagine that removing the child from her current placement would not have a negative effect on her emotional, psychological, and medical condition. Tenn. Code Ann. § 36-1-113(i)(5). Given the immense strides the child has taken while in the care of her foster parents, we must find that this factor weighs in favor of terminating Father's parental rights.

In contrast, it is not clear to this Court that the child would be placed in a similarly healthy and safe physical environment should she be returned to Father's care. Tenn. Code Ann. § 36-1-113(i)(7). Primarily this Court is concerned with Father's complete unwillingness to address his substance abuse issues and his refusal to submit to the drug screens required by his permanency plan. This case was first referred to DCS due to allegations that Father was abusing methamphetamine in the home, and at the time of the child's removal Father was incarcerated for charges related to his methamphetamine abuse. Once, during a supervised visit with the child, Father was asked to leave the session early because he lost his temper, in front of the child, after being asked by a DCS caseworker to take a drug screen. Tenn. Code Ann. § 36-1-113(i)(8).

Clearly, Father's substance abuse issues render him consistently unable to care for the child. Tenn. Code Ann. § 36-1-113(i)(7). Even more troubling is the fact that Father indicated at trial that he does not see these issues as serious, and does not believe he should be subject to DCS drug screens. As such, we are not confident that should the child return to Father's home, she would be in a healthy, safe, and drug-free environment. Tenn. Code Ann. § 36-1-113(i)(7). Although Father was able to pass two drug screens shortly before trial, Father's adamant refusal to submit to prior requested drug screens causes us to question whether Father can maintain whatever level of sobriety he did achieve in the two months before trial. *See In re Zane W.*, 2017 WL 2875924, at *14 (affirming the trial court's decision to terminate mother's parental rights where mother was able to maintain sobriety for a short period before trial, but also showed difficulty maintaining sobriety in the long-term); *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *9 (Tenn. Ct. App. Apr. 27, 2015) (upholding the termination of mother's parental rights where she failed to complete long term substance abuse treatment, and her ability to maintain permanent sobriety was "certainly a speculative proposition."). This concern is buttressed by evidence produced at trial indicating that Father is still involved with the child's Mother, who has in fact lost custody of five other children, one being due to a finding of severe child abuse. Tenn. Code Ann. § 36-1-113(i)(6)−(7).

Finally, it is undisputed that Father has not paid child support during the pendency of this case. Tenn. Code Ann. § 36-1-113(i)(9). While Father insisted at trial that the

court has never entered an order formally setting his child support amount, Father has known that the child is his biological child since November of 2016, when he received the results of his paternity test. *See **In re J.J.C.**,* 138 S.W.3d 919, 927 (Tenn. Ct. App. 2004) (noting that a parent is not excused from offering support simply because the court has not entered a child support order). Father also went so far as to move the trial court for unsupervised visitation with the child in August of 2017. Father clearly understood, at least to some extent, his relationship with the child and consequently his obligation to provide support for her. Accordingly, this factor militates in favor of termination of Father's parental rights. Tenn. Code Ann. § 36-1-113(i)(9).

Only two factors remain: (1) whether the parent or guardian has maintained regular visitation or other contact with the child; and (2) whether a meaningful relationship has otherwise been established between the parent and guardian. Tenn. Code Ann. § 36-1-113(i)(3)–(4). By all accounts, Father consistently visited the child while she was in DCS custody. Father's parenting plan called for two hours of therapeutic visitation per month, and nothing in the record indicates that Father was ever absent from his visitation sessions. On the contrary, Ms. Phillips testified that Father always gave the child his undivided attention during their time together. Ms. Phillips also testified that Father and the child appear to enjoy one another's company and seem to have a bond. Accordingly, these two factors militate against termination of Father's parental rights.

Considering the totality of the evidence both in favor and against termination of Father's parental rights, we must conclude that termination is in the best interests of the child. Although it is undisputed that Father visited the child and appears to have a bond with her, the factors that weigh in favor of termination, particularly Father's failure to address his substance abuse issues and his uncertain living situation, bear more weight in this particular case. Perhaps most important in this case, however, is the marked improvement in the child's physical and emotional condition since being placed with her foster family. The child has bonded with her foster parents, her foster brother, and the foster parents' extended family. The couple wishes to adopt the child. Although Father urges that it is in the child's best interest to be with her biological family, the evidence simply does not support this. Viewing best interests from the perspective of this child, rather than that of Father, clear and convincing evidence supports the conclusion that the child's interests would best be served by remaining in her current placement, where she can be provided permanency in a safe and stable home. Accordingly, we affirm the judgment of the trial court terminating Father's parental rights because clear and convincing evidence supports both the statutory grounds for termination, as well as the finding that termination is in the best interests of the child.

## Conclusion

The judgment of the Juvenile Court of White County is affirmed. Consequently, the termination of the parental rights of Terry K., to his child, Morgan K., is affirmed.

Costs of this appeal are taxed to Appellant Terry K., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE